UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PAULINA ANGELA RUBINO,

                Plaintiff,

     - against -

THE ESTATE OF TOMMASA M.
BETANCOURT, ZENA ORTIZ, ARDELLE
ACOSTA, ZEET RODRIGUEZ, and
EDWARD A. BETANCOURT II, and "JOHN
DOE" and "JANE ROE", said names being
fictitious, it being the intention of Plaintiff to
designate any and all occupants of the premises
at issue herein, and any parties, corporations or
entities, if any, having or claiming an interest or
lien upon the subject premises at issue herein,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-3992 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

Plaintiff Paulina Angela Rubino ("Rubino") brings this action against the Estate of Tommasa M. Betancourt (the "Estate"), Zena Ortiz ("Ortiz"), Ardelle Acosta ("Acosta"), Edward A. Betancourt II ("E. Betancourt"),[1] and Zeet Rodriguez ("Rodriguez") (collectively, "Defendants"), seeking partition by sale of a building (the "Building") at 108 Troutman Street in Brooklyn, New York, and a related accounting. Before the Court is Plaintiff's motion for summary judgment, which requests the following relief: "1) appointing a real estate broker to offer the property for sale; 2) designat[ing] 50% of the sale proceeds to Plaintiff; 3) designat[ing] $647,050 of Defendants' proceeds of the sale to [Plaintiff] for [her] lost income; and 4) any other relief the

---

[1] Defendants claim that E. Betancourt is under the care of the New York State Office for People with Developmental Disabilities because he has intellectual and developmental disabilities. (Defs.' 56.1 Statement, Dkt. 44, ¶ 58.) To date, Defendant E. Betancourt has not appeared in this action. (*See* Pl.'s 56.1 Statement, Dkt. 42-2, ¶ 12; 10/21/2021 Docket Entry of Default.) The Court addresses Defendant E. Betancourt's alleged disability *infra* Discussion Section II.

1

Court deems equitable and just." (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl. Br."), Dkt. 42-1).)[2]

For the reasons discussed below, Plaintiff's motion is denied in its entirety.

## BACKGROUND[3]

### I. The Parties

Plaintiff Rubino resides in Sicily, Italy. (Pl.'s 56.1 Statement, Dkt. 42-2, ¶ 6.) Tommasa M. Betancourt is Plaintiff's late sister.[4] (*Id.* ¶ 25.) Defendants Ortiz, Acosta, E. Betancourt, and Rodriguez are Tommasa M. Betancourt's children and Plaintiff's nieces and nephew. (*See* Ortiz and Acosta RFA Resps., Dkt. 42-7, at ECF 2; Rodriguez RFA Resps., Dkt. 42-8, at ECF 3.)

---

[2] Defendant Rodriguez does not oppose this motion for summary judgment. (*See* Dkt. 33.) Thus, the only Defendants responding to this motion are Ortiz and Acosta.

[3] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. Furthermore, the Court assumes the parties' familiarity with the underlying allegations of this case and, therefore, only recites the facts relevant to resolving the instant motion.

[4] Plaintiff originally named the Estate of Tommasa M. Betancourt as a defendant and alleged the Estate to be in default because it has not yet appeared in this action. (Pl.'s 56.1 Statement, Dkt. 42-2, ¶¶ 7–8.) In her first brief underlying this motion, Plaintiff asserted that the Estate "is responsible for the period of March 2015 through April 2020"—the period in which she and her sister jointly owned the Building—and that the individual Defendants are responsible "for the period of May 2020 to the present and beyond." (Pl.'s Br., Dkt. 42-1, at 11 n.2.) However, Defendants explained in their opposition that the Estate has not been established because "no one has petitioned the Surrogate's Court of the State of New York for any relief relating to . . . Tommasa M. Betancourt, including for the issuance of Letters of Administration." (Defs.' 56.1 Statement, Dkt. 44, ¶ 7). Accordingly, in Plaintiff's reply brief, she dropped her claims against the Estate. (*See* Pl.'s Reply Br., Dkt. 43, at 3–4 ("[D]iscovery has borne out that" that "the Estate of Tommasa M. Betancourt was [not] probated [n]or [were] letters of administration [] entered" and thus the Estate is now "unnecessary as a party to this action[.]").) Accordingly, the Court no longer considers the Estate to be a party to this action.

2

Defendants reside in Brooklyn, New York.[5]  (Pl.'s 56.1 Statement, Dkt. 42-2, ¶¶ 32, 35, 37; Rodriguez RFA Resps., Dkt. 42-8, at ECF[6] 4.)

**II.    The Building**

The Building is located at 108 Troutman Street, Brooklyn, New York.  (Pl.'s 56.1 Statement, Dkt. 42-2, ¶ 1.)  The Building has three stories, containing one commercial space and four 2-bedroom apartments.  (*Id.* ¶¶ 3–4.)  The Building was valued at $1,940,000 as of May 5, 2022.  (*Id.* ¶ 48.)

**A.    Ownership of the Building**

The Building's deed lists spouses Anthony and Lucia Giacalone as owners of the Building in fee simple.[7]  (*Id.* ¶ 14.)  Anthony and Lucia Giacalone acquired their interest in the property in 1979.  (*Id.* ¶ 15.)  Plaintiff and Tommasa M. Betancourt were the sole children of Anthony and Lucia Giacalone.  (*Id.* ¶ 25.)  Anthony Giacalone predeceased Lucia Giacalone and died intestate.  (*Id.* ¶¶ 16, 19.)  Then Lucia Giacalone died intestate in 2015 and no will was probated for her estate.  (*Id.* ¶¶ 21, 23–24.)  All parties agree that "[b]y operation of the laws of intestate succession in the State of New York, [Plaintiff] Rubino and her sister, Tommasa M. Betancourt . . . are and

---

[5] This matter is properly before this Court pursuant to the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a)(2) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state[.]").

[6] The Court notes that Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[7] Defendants note that "[a]s a practical matter" the Building's "last recorded Deed dates back to 1979, and three prior legal owners, Anthony Giacalone, Lucia Giacalone and Tommasa M. Betancourt, died intestate without anything in the court or land records reflecting these deaths' effect on chain of title." (Defs.' Ortiz and Acosta's Br. in Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Opp. Br."), Dkt. 44-1, at 2 n.1.)  They contend that this will make selling the Building difficult because "title companies will want to be sure that the seller is indeed qualified to convey the property." (*Id.*)  The Court finds that this is a logistical issue to be addressed by the parties at the time of a partition, and is not relevant to deciding the questions of law at issue in this motion.

were the rightful owners, as tenants in common, of the [Building] upon Lucia Giacalone's passing in 2015, each ow[n]ing 50%." (*See id.* ¶ 26; Defs.' 56.1 Statement, Dkt. 44, ¶ 26.)

Tommasa Betancourt passed away on April 4, 2020. (Pl.'s 56.1 Statement, Dkt. 42-2, ¶ 41.) She was unmarried at the time of her death, died intestate, and no will was probated for her estate. (*Id.* ¶¶ 43–45.) Upon Tommasa Betancourt's death, her 50% interest in the Building passed to her four children, Defendants Ortiz, Acosta, Rodriguez, and E. Betancourt, split equally. (*See* Ortiz and Acosta RFA Resps., Dkt. 42-7, at ECF 2; Rodriguez RFA Resps., Dkt. 42-8, at ECF 3.) Thus, today, Plaintiff owns a 50% interest in the Building and each individual Defendant owns a 12.5% interest.

### B.   Occupancy of the Building

Currently, three of the four apartments are occupied by Defendants Ortiz, Acosta, and E. Betancourt. (Pl.'s 56.1 Statement, Dkt. 42-2, ¶¶ 9–11.) Acosta and E. Betancourt have occupied their apartments since before 2015. (*Id.* ¶¶ 32, 35.) Ortiz has occupied her apartment since July 2018. (*Id.* ¶ 37.) Ortiz, Acosta, and E. Betancourt have never paid rent while living in the Building. (*Id.* ¶¶ 33, 36, 38.) Defendant Rodriguez does not reside in the Building. (*Id.* ¶ 13.)

The fourth apartment and the first-floor commercial retail space are occupied by Exodus Christian Center (the "Center"). (*Id.* ¶ 29.) The Center has occupied those spaces since 2015 (*id.*), does not have a lease (*id.* ¶ 31), and pays $2,590 in monthly rent (*id.* ¶ 30).[8] Before her death in 2020, Tommasa Betancourt also resided in the Building from "at least as early as 2015[.]" (*Id.* ¶ 7.)

---

[8] Defendant Ortiz's husband, Robert Ortiz, has been collecting the Center's rent payments since May 2020. (Defs.' Resps. to Interrogs., Dkt. 42-10, at ECF 2.) Defendants claim that those payments "have been inconsistent since August 2020." (*Id.*) Tommasa Betancourt collected the Center's rent payments before that, but the parties "have no knowledge of the specifics of those payments." (*Id.*)

4

### C.   Building Expenditures

The responding Defendants Ortiz and Acosta assert that they have spent $50,269.86 of their own money on maintenance and upkeep of the Building and continue to expend money with respect to the Building's carrying costs. (Defs.' 56.1 Statement, Dkt. 44, ¶¶ 55–56.)[9] In opposition, Plaintiff argues that Defendants are estopped from asserting these expenses now because they responded in their interrogatories during discovery that they had not made any payments with respect to the Building's expenses. (Pl.'s 56.1 Reply, Dkt. 43-1, ¶¶ 55–56; *see also* Defs.' Resps. to Interrogs., Dkt. 42-10, at ECF 2.) However, Ortiz and Acosta's interrogatory responses are not unequivocal. In response to the question, "Describe, in detail, any expenses You paid related to the Property, including, but not limited to, taxes, maintenance, repairs, upgrades and utilities from 2015 to the present[,]" they answered, "[n]o payments were made." (Defs.' Resps. to Interrogs., Dkt. 42-10, at ECF 2.) But in response to the next question, "Describe, in detail, any expenses Tommasa M. Betancourt or the Estate . . . paid related to the Property[,]" Ortiz and Acosta asserted "lack of knowledge and information, as these matters are not handled by this party, but by Robert Ortiz (husband of Zena Ortiz)[.]" (*Id.* at ECF 3.) And in Defendants' exhibits, it is apparent that Robert Ortiz did pay for expenses related to the Building. (*See, e.g.*, Dkt. 44-7, at ECF 2 (Robert Ortiz paying over $2,000 in Building property taxes on June 9, 2022); Dkt. 44-6, at ECF 3 (Robert Ortiz paying over $1,400 in Building water utilities on August 13, 2020).) Furthermore, it is only logical that Defendants, as owners and residents of the Building, would have paid certain expenses, such as property taxes. Thus, there is a genuine issue of material fact regarding what expenses Defendants or their household members have paid related to the Building.

---

[9] Although the Court cites only to Defendants' 56.1 Statement for this assertion, this fact is in dispute.

Lastly, all parties agree that Plaintiff has not paid any expenses related to the subject property. (Defs.' 56.1 Statement, Dkt. 44, ¶ 57; Pl.'s 56.1 Reply, Dkt. 43-1, ¶ 57.)

### III. Procedural History

Plaintiff filed her Complaint on July 14, 2021. (Compl., Dkt. 1.) Defendant Rodriguez filed an Answer on August 26, 2021. (Rodriguez Answer, Dkt. 10.) Defendants Ortiz and Acosta filed their Answer on September 17, 2021. (Ortiz and Acosta Answer, Dkt. 14.) On October 19, 2021, Ortiz and Acosta filed an Amended Answer. (Am. Answer, Dkt. 23.)

On February 22, 2022, Magistrate Judge Ramon E. Reyes held a video settlement conference with the parties. (2/22/2022 Minute Entry.) Discussions were held off-record and thus no transcript is available. (*Id.*) The settlement conference resumed on March 15, 2022, where again, discussions were held off-record with no transcript available. (3/15/2022 Minute Entry.) The conference did not result in a settlement, and the parties were directed to submit a revised case management plan. (*Id.*)

Plaintiff filed her request for a pre-motion conference in anticipation of filing a motion for partial summary judgment on April 19, 2022. (Dkt. 32.) The Court denied that request, finding that a conference was unnecessary, and directed the parties to agree on a briefing schedule. (7/14/2022 Docket Order.) The instant motion was fully briefed on September 27, 2022. (*See* Dkts. 42–44.)

### LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

6

prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

In determining whether a genuine issue of fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis omitted).

## DISCUSSION

Plaintiff's motion for summary judgment argues that under New York Real Property Actions and Proceeding Law ("RPAPL") Section 901, she is entitled to a partition and sale of the Building because she is a tenant in common and a physical partition cannot be made "without great prejudice to the owners." (Pl.'s Br., Dkt. 42, at 6 (citing N.Y. REAL PROP. ACTS. LAW § 901 and *Melnick v. Press*, 809 F. Supp. 2d 43, 58 (E.D.NY. 2011)).) She then glibly invokes the Uniform Partition of Heirs Property Act ("UPHPA" or the "Act") to argue that if the Court orders the partition and sale, the Building "should be listed for sale on the open market by a licensed New York broker appointed by the Court" because "[i]t is indisputable that the Property is an '*heirs*

7

*property*[.]'" (Pl.'s Br., Dkt. 42, at 8–9 (citing RPAPL § 993) (emphasis added).) Yet, despite submitting well over two hundred pages in support of her motion for summary judgment (*see* Dkts. 42, 43), she devotes mere paragraphs to the UPHPA (*see* Pl.'s Br., Dkt. 42-1, at 8–9; Pl.'s Reply Br., Dkt. 43, at 1–2) and, inexplicably, fails to acknowledge or address that if the Court determines that the Building is an "heirs property," it can only be partitioned after the Act's comprehensive and escalatory procedures are complied with.[10] Indeed, if a partition action is governed by the UPHPA, the Act *supersedes* the general partition statute (including RPAPL Section 901)—rendering virtually all the arguments and cited law in Plaintiff's motion irrelevant. *Id.* § 993(3)(c). The Act's procedures include an obligatory settlement conference and a mandatory process for Defendants to buyout Plaintiff's interest, none of which Plaintiff has alleged—much less shown—to have occurred in this case.

Therefore, as discussed below, the Court finds that Plaintiff is not entitled to a partition and sale of the Building at this stage, given that the Building is "heirs property" under the UPHPA, and Plaintiff has offered no evidence that the Act's procedural prerequisites have been met.

I.  **Plaintiff Offered No Evidence of Compliance with the UPHPA**

    A.  **Legal Standard**[11]

In any partition action for real property commenced after December 6, 2019, the Court must first determine "after notice and the right to be heard afforded to each party," whether the

---

[10] The Court is troubled by Plaintiff's selective and misleading invocation of a portion of the Act while completely ignoring the rest of the Act's requirements. Whether this was the product of bad faith or gross incompetence, it is inexcusable.

For their part, Defendants never even mention the UPHPA in their almost two hundred pages filed in opposition to the motion. (*See generally* Defs.' Opp. Br., Dkt. 44-1.)

[11] The Court only briefly summarizes the portions of the UPHPA relevant to this motion and does not recite all of the requirements and details of the Act.

property at issue is "heirs property." RPAPL § 993(3)(a)–(b); *see also Pachter v. 3063 Brighton 8 Props. LLC*, 130 N.Y.S.3d 653, at *7 (N.Y. Sup. Ct. Sept. 29, 2020) (citing RPAPL § 993(3)(a)).

### 1. Definition of "Heirs Property"

The Act defines "heirs property" as:

> [R]eal property held in tenancy in common which satisfies all of the following requirements as of the filing of a partition action: (i) there is no agreement in a record binding all of the co-tenants which governs the partition of the property; (ii) any of the co-tenants acquired title from a relative, whether living or deceased; (iii) the property is used for residential or agricultural purposes; and (iv) any of the following applies: (A) twenty percent or more of the interests are held by co-tenants who are relatives; (B) twenty percent or more of the interests are held by an individual who acquired title from a relative, whether living or deceased; (C) twenty percent or more of the co-tenants are relatives of each-other; or (D) any co-tenant who acquired title from a relative resides in the property.

RPAPL § 993(2)(e). If property meets the definition of "heirs property," "the property shall be apportioned in accordance with [the UPHPA] unless all of the co-tenants otherwise agree in a record." RPAPL § 993(3)(b); *see Maspeth Place Corp. v. Walcott-Francis*, No. 21313/2020E, 2022 WL 222431, at *1 (N.Y. Sup. Ct. Jan. 26, 2022) (citing RPAPL § 993(3)(b)); *see also id.* ("Unlike partition actions brought under RPAPL § 915, the new statute provides certain protections and procedures which must be followed for those matters which are determined to be 'Heirs Property.'"); RPAPL § 993(3)(c) ("This section shall supplement the general partition statute of this article and, if an action is governed by this section, shall replace the provisions of such general partition statute that are inconsistent with this section.").

### 2. Step 1: Settlement Conference

As an initial step, the Court is required to hold a settlement conference "within sixty days after the date" the partition action is filed, for the purpose of holding settlement discussions pertaining to the rights and obligations of the parties with respect to the subject property. *See*

9

RPAPL § 993(5)(a); *see also Maspeth Place Corp.*, 2022 WL 222431, at *1 (citing RPAPL § 993(5)(a)). "Upon the filing of a [partition action], the court shall promptly send a notice to parties advising them of the time and place of the settlement conference, the purpose of the conference and the requirements of [the UPHPA]", and "Plaintiff shall post a copy of the settlement conference notice in a conspicuous place on the property within twenty days of the date of [the court's issuance of the settlement conference] notice." RPAPL § 993(5)(b).

At the conference, the parties shall "negotiate in good faith to reach a mutually agreeable resolution, including, but not limited to" a tenancy in common agreement, a co-tenant buyout, a partition in kind, an open market sale, "or any other agreement or loss mitigation that is fair and reasonable[.]" RPAPL § 993(5)(e). "If the parties do not reach a mutually agreeable resolution, the . . . judicial hearing officer . . . shall make a report of findings of fact, conclusions of law and recommendations for relief to the court concerning any party's failure to negotiate in good faith. . . . If the court determines a plaintiff has failed to negotiate in good faith, the partition action shall be dismissed." *Id.* § 993(5)(f).

3. Step 2: Co-Tenant Buyout

If the settlement conference is not successful, the next step is for the Court to offer the non-moving co-tenants an opportunity to buy out the moving co-tenant's share. *See* RPAPL § 993(7)(a). Pursuant to this provision, the Court must give notice "to all parties[,] identifying the owners of interest that have sought partition by sale, the percentage interests such owners allege to hold[,] and . . . the remaining co-tenants[' rights] to avert partition by sale" through a buyout. *Id.* Accordingly, the Court must also "determine the fair market value of the heirs property" by ordering an appraisal by a disinterested real estate appraiser, *id.* § 993(6)(a), or adopting the value the co-tenants agree to, *id.* § 993(6)(b). The Act then specifies various procedures and time limits

10

for how the parties can approve the appraisal value and exercise their buyout options. *See generally id.* § 993(6) and 993(7).

####      4. Step 3: Partition Alternatives

An actual partition can only occur *after* a buyout is noticed and the parties are given the statutorily prescribed time to exercise their buyout options. *See id.* § 993(7)(e) and 993(8). Section 993(9) then lists non-exhaustive factors that the Court must consider in deciding between a partition in kind versus a partition by sale, including "a co-tenant's sentimental attachment to the property" and "the degree to which any [resident] co-tenant would be harmed if the co-tenant could not continue the same use of the property." *Id.* § 993(9)(iv)–(v). Importantly, in considering whether to order partition in kind, "the court shall approve a request by two or more parties to have their individual interests aggregated." *Id*. § 993(8).

### B. Application

There is admittedly minimal state case law regarding the application of the UPHPA and virtually no law applying the UPHPA in federal courts.[12] Thus, this is a case of first impression.

####      1. The Building is Heirs Property

The Court finds that the Building is heirs property. The parties meet virtually all the requirements of Section 993(2)(e) and the parties themselves agree that the property is heirs property. (*See* Pl.'s Reply Br., Dkt. 43, at 1–2 (Plaintiff noting that "[r]esponding Defendants have conceded that . . . the Property is 'heirs property' as defined in the UPHPA" because Defendants did not contest Plaintiff's characterization of the Building as such).) Furthermore, Plaintiff's action was filed on July 14, 2021 (Compl., Dkt. 1), almost two years after the UPHPA took effect.

---

[12] The Court assumes this is because of the relative newness of the law, passed shortly before the COVID-19 pandemic, and the ensuing backlog of cases in New York state and federal courts.

Thus, the UPHPA clearly governs this partition action. *Maspeth Place Corp.*, 2022 WL 22243, at *1 (citing RPAPL § 993(3)(b)).

        2.        Plaintiff Has Not Established That the 2022 Settlement Conference Was Held Pursuant to UPHPA Requirements

Plaintiff states in conclusory fashion that "[a] settlement conference was held with the Hon. Ramon E. Reyes, U.S.M.J. on February 22, 2022 and continued on March 15, 2022. Accordingly, the requirement of N.Y. Real Prop. Acts. Law § 993(5) has been met." (Pl.'s Br., Dkt. 42-1, at 9 (internal citation omitted).) The Court disagrees.

Section 993(5) lays out meticulous requirements for a UPHPA settlement conference, including that it must occur within 60 days after the filing of the action, and that the "judicial hearing officer . . . make a report of findings of fact, conclusions of law and recommendations for relief to the court concerning any party's failure to negotiate in good faith[.]" RPAPL § 993(5)(f). The parties have not submitted any such report from the parties' 2022 settlement conference. To the contrary, both phases of the settlement conference were conducted off-record (as is customary in this District) more than half a year after this lawsuit was initiated.[13] (*See* 2/22/2022 Minute Entry; 3/15/2022 Minute Entry.) The UPHPA also requires that "the court shall promptly send a notice to parties advising them of the time and place of the settlement conference, the purpose of the conference and *the requirements of [the UPHPA]*." RPAPL § 993(5)(a)–(b) (emphasis added). Plaintiff was also required to post a copy of such notice in "a conspicuous place" on the Building within 20 days of the issuance of the Court's notice. RPAPL § 993(5)(b). But Plaintiff has offered no evidence of compliance with these notice requirements. Indeed, given Defendants' complete

---

[13] It is the Court's understanding that neither Plaintiff nor Defendants advised Judge Reyes of the applicability of the UPHPA or sought compliance with it during their settlement conferences with him.

12

lack of reference to the UPHPA in their opposition papers, the Court can only conclude that Defendants are currently unaware of their rights under the UPHPA. Thus, the Court finds that the parties have not yet complied with the UPHPA's settlement conference requirement.[14]

### 3. Plaintiff Establishes No Facts Regarding a Co-Tenant Buyout

Even assuming *arguendo* that the 2022 settlement conference meets the UPHPA requirements, the Court still cannot grant a partition by sale because the parties have established no facts regarding whether they have complied with the co-tenant buyout procedures required by Sections 993(6) and 993(7) of the UPHPA. *See id.* § 993(8). The Court certainly has not participated in such proceedings. Nor have the parties indicated that another judicial officer has given Defendants an opportunity to exercise their buyout options as required by the UPHPA.

Thus, pursuant to UPHPA Section 993(7)(a), the Court now notifies all parties in this action of their percentage interests in the Building: Plaintiff owns a 50% interest and the individual Defendants each own a 12.5% interest. (*See* Ortiz and Acosta RFA Resps., Dkt. 42-7, ECF 1; Rodriguez RFA Resps., Dkt. 42-8, ECF 3.) In particular, the Court gives notice to Defendants Ortiz, Acosta, Rodriguez, and E. Betancourt, of their rights to prevent partition by sale by purchasing all of Plaintiff's 50% interest. RPAPL § 993(7)(a).

\*\*\*

---

[14] Although this action has not proceeded in accordance with the UPHPA to date, a resolution that is compliant with the Act can still be reached if the parties begin complying with the Act now. *See Maspeth Place Corp.*, 2022 WL 222431, at \*1 (ordering a settlement conference pursuant to the UPHPA two years after partition action was filed after discovering that "[i]n this proceeding, the[ UPHPA's] mandatory provisions have not yet been complied with"); *see also 2nd Ave. Holding 1 LLC*, 2020 WL 1248754, at \*4 (ordering settlement conference pursuant to UPHPA and indefinitely postponing the conference past the 60-day deadline, "[i]n light of the worldwide COVID-19 (coronavirus) crisis").

In sum, the mandatory provisions of the UPHPA have not yet been complied with. Thus, Plaintiff's motion for summary judgment is denied.[15] *See Maspeth Place Corp.*, 2022 WL 222431, at *1 (rejecting motion to confirm Report of Referee because the settlement conference provisions of UPHPA Section 993(5) "ha[ve] not yet been complied with").

## II.  Defendant E. Betancourt's Alleged Incapacitation

As briefly discussed above, Defendants Ortiz and Acosta allege that Defendant E. Betancourt is under the care of the New York State Office for People with Developmental Disabilities. (Defs.' 56.1 Statement, Dkt. 44, ¶ 58.) To date, E. Betancourt has not appeared in this action and an entry of default was entered against him October 21, 2021. (*See* Pl.'s 56.1 Statement, Dkt. 42-2, ¶ 12; 10/21/2021 Docket Entry of Default.) In response, Plaintiff argues that E. Betancourt's "alleged incapacitation" has no "bearing on this case" because a defendant "can be sued in the same manner as any other individual" as long as he has not been "judicially declared incompetent." (Pl.'s Reply Br., Dkt. 43, at 7 (citing *Rivera v. N.Y.C. Transit Auth.*, 33 N.Y.S.3d 900 (N.Y. App. Div. 2016)).)

Plaintiff, again, is incorrect. The courts may not "shut their eyes to the special need of protection of a litigant actually incompetent but not yet judicially declared as such." *Sengstack v. Sengstack*, 176 N.Y.S.2d 337, 342 (N.Y. 1958). Further, "an adult incapable of adequately prosecuting or defending [his] rights" cannot have a default judgment entered against him "unless a guardian ad litem is first appointed." *Sarfaty v. Sarfaty*, 443 N.Y.S.2d 506, 507 (N.Y. App. Div. 1981) (cleaned up); *see also Oneida Nat'l Bank & Trust Co. of Cent. N.Y. v. Unczur*, 326 N.YS.2d 458, 461 (N.Y. App. Div. 1971) ("No default judgment may be entered against an adult incapable

---

[15] Because the Court finds that Plaintiff is not entitled to a sale and partition at this stage of the litigation, the Court will not address Plaintiff's remaining arguments in her motion, including her claims regarding the accounting incidental to the sale.

of adequately protecting his rights for whom a guardian ad litem has been appointed unless twenty days have expired since the appointment.") (citing N.Y. C.P.L.R. 1203). Moreover, the burden is on the plaintiff "who has notice that a defendant in [her] action is under mental disability, to bring that fact to the court's attention and permit the court to determine whether a guardian ad litem should be appointed to protect such defendant's interests." *Sarfaty*, 443 N.Y.S.2d at 507 (vacating default judgment because the plaintiff failed to meet that burden).

Here, Defendants Ortiz and Acosta claim that E. Betancourt is "suffering from intellectual and developmental disability" and is therefore "not capable of defending himself in this action." (Ortiz Aff., Dkt. 44-2, at ¶ 10; Acosta Aff., Dkt. 44-3, at ¶ 10.) They further assert that "Plaintiff is aware of this fact, but is nonetheless attempting to hold him in default for not defending this action." (Ortiz Aff., Dkt. 44-2, at ¶ 10; Acosta Aff., Dkt. 44-3, at ¶ 10.) If these assertions are true, then Plaintiff had the burden of raising E. Betancourt's disability with the Court so that a determination could be made regarding whether a guardian ad litem should be appointed. *See Sarfaty*, 443 N.Y.S.2d at 507. Accordingly, the Court grants Defendants' request and orders Plaintiff to notify the New York State Office for People with Developmental Disabilities of this action against E. Betancourt. (Defs.' Opp. Br., Dkt. 44-1, at 11.) In addition, Defendants Ortiz and Acosta shall produce to the Court documentation supporting their allegations regarding Defendant E. Betancourt's disability under seal. (*See* Ortiz Aff., Dkt. 44-2, at ¶ 10; Acosta Aff., Dkt. 44-3, at ¶ 10.) The Court will reserve judgment on how to proceed with Defendant E. Betancourt pending Defendants' submissions.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is denied in its entirety. The parties are directed to file a joint status report apprising the Court of what measures they have taken, if any, to comply with the UPHPA. Specifically, the parties shall include facts

regarding (1) how their 2022 settlement conference did or did not comply with Section 993(5); and (2) whether Defendants have had the opportunity to exercise their buyout options pursuant to Sections 993(6) and 993(7).[16]

Furthermore, Defendants Ortiz and Acosta are ordered to file documentation supporting their allegations regarding Defendant E. Betancourt's disability. Additionally, Plaintiff is directed to notify the New York State Office for People with Developmental Disabilities of this action against E. Betancourt and file a status report updating the Court once she has done so. (*See* Defs.' Opp. Br., Dkt. 44-1, at 11.)

The parties will complete the above within twenty-one (21) days of this Memorandum and Order. After receipt of the parties' filings, the Court will set dates for further proceedings in compliance with the UPHPA.

Lastly, the Clerk of Court is respectfully directed to terminate the Estate of Tommasa M. Betancourt as a party to this litigation.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 29, 2023
       Brooklyn, New York

---

[16] As mentioned above, the Court notes that although the UPHPA's 60-day deadline for holding a settlement conference has long passed in this case, the parties can still seek to hold one before Judge Reyes. *See Maspeth Place Corp.*, 2022 WL 222431, at *1 (scheduling a UPHPA settlement conference almost two years after partition action initiated, upon court belatedly realizing that UPHPA applied).